**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DENNIS VENA,** | ) | **Case No.** |
| | ) | |
| **Plaintiff,** | ) | **Judge:** |
| | ) | |
| **v.** | ) | **Magistrate Judge:** |
| **THOMAS MORE SOCIETY, an Illinois** | ) | |
| **not-for-profit corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | **JURY DEMAND** |
| | ) | |

## COMPLAINT

Plaintiff DENNIS VENA, by and through his undersigned counsel, and for his Complaint against Defendant the THOMAS MORE SOCIETY, alleges and states as follows:

## NATURE OF THE ACTION

1. This is an action for employment discrimination, retaliation, harassment, denial of employee benefits, wage and hour violations, and wrongful misclassification arising from Defendant Thomas More Society's ("TMS" or "Defendant") unlawful treatment of Plaintiff Dennis Vena ("Mr. Vena" or "Plaintiff") throughout his employment and upon his wrongful termination on October 13, 2023.

2. Defendant discriminated against Plaintiff on the basis of his age in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621–634 ("ADEA"), and its amendment, the Older Workers Benefits Protection Act of 1990 ("OWBPA").

3. Defendant discriminated against Plaintiff on the basis of his own disability and his association with his disabled spouse in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101–12213 ("ADA").

4. Defendant retaliated against Plaintiff for opposing unlawful discrimination and for requesting reasonable accommodations, in violation of both the ADEA and the ADA.

5. Defendant violated the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b) ("MSP Act"), by twice attempting to involuntarily terminate Plaintiff's private group health insurance coverage solely on the basis that he was enrolled in Medicare.

6. Defendant violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), by wrongfully excluding Plaintiff from its IRS Form 5304-SIMPLE IRA Retirement Plan for six consecutive years and failing to make required corrective contributions.

7. Defendant violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), by willfully misclassifying Plaintiff as an exempt employee and failing to pay him overtime compensation at one and one-half times his regular rate of pay for all hours worked in excess of forty (40) hours per workweek throughout his eleven-year employment, despite requiring him to work in excess of seventy (70) hours per week.

8. Defendant violated the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"), by failing to pay Plaintiff the overtime compensation required under Illinois law for all hours worked in excess of forty (40) hours per workweek.

9. Defendant violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA"), by failing to pay Plaintiff all earned final compensation, including accrued paid time off ("PTO"), upon the termination of his employment.

**JURISDICTION AND VENUE**

10.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 29 U.S.C. § 626(c) (ADEA), 42 U.S.C. § 12117(a) (ADA), 29 U.S.C. § 1132 (ERISA), 42 U.S.C. § 1395y(b) (MSP Act), and 29 U.S.C. § 216(b) (FLSA).

11.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under the Illinois Minimum Wage Law and the Illinois Wage Payment and Collection Act pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the federal claims.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed within this district, Defendant maintains its principal office in Chicago, Illinois, and a substantial part of the events giving rise to the claims occurred in this district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

13.     On August 8, 2024, Plaintiff timely filed a Charge of Discrimination (Charge No. 440-2024-10995) with the United States Equal Employment Opportunity Commission ("EEOC"), Chicago Field Office, alleging age discrimination, disability discrimination, and retaliation by Defendant.

14.     On January 9, 2026, the EEOC issued a Determination and Notice of Rights (Notice of Right to Sue) to Plaintiff, a true and correct copy of which is attached hereto as Exhibit A. Plaintiff received said notice on or about January 9, 2026. This Amended Complaint is filed within ninety (90) days of Plaintiff's receipt of the EEOC's Notice of Rights, as required by 29 U.S.C. § 626(e) and 42 U.S.C. § 12117(a).

3

15. Plaintiff has fulfilled all conditions precedent to the institution of this action under the ADEA and ADA. The ERISA, MSP Act, FLSA, IMWL, and IWPCA claims do not require exhaustion of administrative remedies prior to filing suit.

## THE PARTIES

16. Plaintiff Dennis Vena is a natural person domiciled in Cook County, Illinois. He was born on July 24, 1944, and was 79 years of age at the time of his termination on October 13, 2023. At all relevant times, Mr. Vena was an "employee" within the meaning of the ADEA, 29 U.S.C. § 630(f), the ADA, 42 U.S.C. § 12111(4), ERISA, 29 U.S.C. § 1002(6), and the FLSA, 29 U.S.C. § 203(e).

17. Defendant Thomas More Society ("TMS") is an Illinois not-for-profit corporation with its principal place of business at 309 West Washington Street, Suite 1250. Chicago, Illinois 60606. TMS operates as a national public interest law firm. At all relevant times, TMS employed more than twenty (20) employees and constituted an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b), the ADA, 42 U.S.C. § 12111(5), ERISA, 29 U.S.C. § 1002(5), the MSP Act, 42 U.S.C. § 1395y(b), the FLSA, 29 U.S.C. § 203(d), the IMWL, 820 ILCS 105/3(c), and the IWPCA, 820 ILCS 115/2.

18. By 2022, TMS employed thirty-eight (38) full-time employees in eleven states, well exceeding the statutory thresholds applicable under the MSP Act and each of the foregoing statutes.

4

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

### A. Mr. Vena's Employment and Duties at TMS

19. On April 12, 2012, TMS hired Mr. Vena as its Computer Servicer at an initial annual salary of $25,000.00. At the time of hire, Mr. Vena was 67 years of age – the second-oldest employee at TMS at that time. Only TMS President Thomas Brejcha was one year older.

20. Prior to joining TMS, Mr. Vena had an extensive professional background. He was a licensed Illinois attorney, a partner at Garvey and Novy, Ltd. (where his practice included litigation, transactional work, administrative law, estate law, and probate), and Senior Vice President, General Counsel, and Corporate Secretary of Citibank FSB Illinois.

21. TMS's organizational structure vested all strategy, planning, policy, budgeting, hiring, and supervisory authority at the executive level. At no point during his employment did Mr. Vena: (a) manage or supervise any TMS employee; (b) have authority to hire or fire staff; (c) have any employees designated to report to him; or (d) have authority to create obligations binding on TMS without approval from the Managing Director and, for IT expenditures, the outside IT consultant.

22. Mr. Vena worked alone throughout his tenure, maintaining operations without any assigned support staff. His work was hands-on, non-managerial, and operational in nature, including IT network operations and maintenance; multi-state regulatory filings; payroll and accounts payable processing; benefits administration; real estate lease negotiation; and financial reporting. All authority over strategic and personnel decisions resided with TMS's President and Managing Director.

23. Over his more than ten (10) years of service, Mr. Vena's responsibilities expanded dramatically as TMS grew from a local Chicago operation to a thirty-eight-employee organization spanning eleven states. TMS continuously added obligations to his workload but never provided him any staff support or assistance.

24. At all relevant times, Mr. Vena performed his duties in a competent manner meeting or exceeding TMS's reasonable expectations for the work he was assigned.

25. Mr. Vena's final annual salary at the time of his termination was $89,995.61. Throughout his employment, TMS classified Mr. Vena as an exempt employee and paid him only his fixed salary, without any overtime compensation.

**B. TMS's Unlawful Overtime Practices -- FLSA and IMWL Violations**

26. Throughout his eleven-year employment at TMS -- from April 12, 2012 through October 13, 2023 -- TMS required and suffered or permitted Mr. Vena to work in excess of forty (40) hours per week on a consistent, regular basis. In the final years of his employment, Mr. Vena regularly worked in excess of seventy (70) hours per week.

27. TMS never paid Mr. Vena any overtime compensation for any hours he worked in excess of forty (40) per workweek, despite his being consistently required to work such hours for eleven years.

28. No younger TMS employee was required to sustain the same late-night, extended-hour work burden as Mr. Vena. Younger employees were permitted to work ordinary hours and leave the office at normal times while Mr. Vena remained at the office past 10:00 p.m. and, at times, until midnight.

29. Mr. Vena's late hours and extended workload at TMS's Chicago office were recorded and stored by TMS's own security network cameras, the office building's elevator camera recordings, and the main first-floor building exit camera -- records that were maintained for all eleven years of his employment. Additionally, Mr. Vena's workload volume, times, and dates were recorded in TMS's Online QuickBooks accounting application throughout his entire tenure.

30. Under the FLSA, an employer may claim an exemption from overtime requirements only for employees who are (a) paid on a salary basis above the applicable threshold; and (b) whose primary duty consists of executive, administrative, or professional work as defined by Department of Labor regulations. 29 C.F.R. Part 541.

31. Mr. Vena does not qualify for any FLSA exemption. He was not an executive employee because he did not customarily and regularly direct the work of two or more other employees, and he had no authority to hire or fire. He was not an administrative employee because his primary duty was not the exercise of discretion and independent judgment with respect to matters of significance -- rather, he performed hands-on operational and technical work requiring approval for even routine expenditures. He was not a professional employee because his primary duty was not work requiring advanced knowledge in a field of science or learning customarily acquired through a prolonged course of specialized intellectual instruction.

32. TMS's misclassification of Mr. Vena as exempt was willful within the meaning of 29 U.S.C. § 255(a). TMS, as a law firm staffed by attorneys, knew or recklessly disregarded whether its conduct was prohibited by the FLSA. The three-year limitations period for willful FLSA violations applies, extending back to October 13, 2020.

7

33. As a direct and proximate result of TMS's willful FLSA violations, Mr. Vena was deprived of overtime compensation at the rate of one and one-half times his regular rate of pay for each hour worked in excess of forty per workweek throughout the three-year period preceding the filing of this action, plus an equal amount in liquidated damages, plus attorneys' fees and costs.

### C. TMS's Pattern of Age Discrimination

34. Beginning no later than 2021 and continuing through the date of his termination, TMS engaged in a pattern and practice of age discrimination against Mr. Vena and other employees over the age of 65.

35. TMS replaced Mr. Vena in his role as Director of Operations with a substantially younger employee, stripping him of his primary responsibilities while retaining him at reduced duties.

36. Following his replacement, TMS systematically excluded Mr. Vena and other older employees from important meetings, communications, and decision-making processes, thereby hindering their ability to function effectively in their roles.

37. TMS management prevented older employees, including Mr. Vena, from including work product generated during a prior period in performance reviews, artificially and unfairly depressing older employees' performance ratings.

38. TMS management repeatedly belittled Mr. Vena's information technology skills and contributions, despite the fact that Mr. Vena had designed, built, and managed TMS's multi-state computer network for ten years.

39.     On two separate occasions within an eighteen-month period, TMS management proposed to drop BlueCross BlueShield private group health insurance for all TMS employees 65 years of age and older, while retaining equivalent coverage for younger employees. Both proposals violated federal law. The first was withdrawn following intervention by TMS's President; the second was withdrawn only after Mr. Vena identified the applicable federal prohibitions.

40.     When Mr. Vena experienced a medical episode on August 2, 2023, and his physician directed him to remain home, TMS withheld his Short-Term Disability Insurance application, refused to complete the employer's required portion, and stripped him of his accrued PTO benefits without his consent -- actions not taken against younger employees in comparable circumstances.

41.     TMS terminated Mr. Vena on October 13, 2023, while he remained under a physician's directive to remain home and while his Short-Term Disability claim remained pending and unprocessed by TMS.

42.     TMS's refusal to grant Mr. Vena's request to work from home was discriminatory and without legitimate justification. TMS's President had regularly and routinely granted Mr. Vena the right to work remotely on prior occasions. TMS also granted comparable remote work flexibility to younger TMS employees. TMS's denial of Mr. Vena's remote work request, while extending such flexibility to similarly situated younger employees, constitutes direct evidence of age-based disparate treatment.

### D. Mrs. Vena's Disability and TMS's Associational Discrimination and Harassment

43.     Mr. Vena's wife suffers from a chronic and severe cardiac and pulmonary condition constituting a disability within the meaning of the ADA, 42 U.S.C. § 12102. Her condition required multiple critical surgical procedures at Northwestern Memorial Hospital, including heart valve replacement surgery performed on a beating heart, and multiple pulmonary balloon angioplasty procedures to clear massive blood clots that reduced her blood oxygen to below life-sustaining levels. Northwestern Memorial Hospital is the only hospital in Illinois performing the pioneering pulmonary angioplasty procedure required by her condition.

44.     Mrs. Vena's post-surgical care required continuous monitoring of critical life-support equipment, including oxygen delivery systems. At various times during her recovery, Mrs. Vena required continuous supplemental oxygen administered through medical-grade equipment. The proper functioning of this equipment was essential to her survival. Specifically, failure to monitor correct oxygen flow rates, tube disconnections, and power interruptions that shut off the oxygen delivery equipment -- each of which required immediate manual switchover to battery backup equipment -- posed a direct and critical risk to Mrs. Vena's oxygen supply and life.

45.     TMS had actual knowledge of Mrs. Vena's disability and ongoing critical surgical procedures and post-surgical care needs, including her dependence on monitored oxygen support equipment at home.

46.     On the morning of June 27, 2023, while Mrs. Vena was undergoing a pulmonary angioplasty procedure at Northwestern Memorial Hospital, a TMS administrative employee telephoned Mr. Vena at the hospital and demanded that he leave the hospital during the procedure to deliver a server room security key to the TMS office. TMS made this demand

notwithstanding that Mr. Vena's departure would have left Mrs. Vena alone and without any family support or assistance at a critical moment in her surgical care.

47. On a separate occasion, TMS again telephoned Mr. Vena at the hospital during a surgical procedure involving Mrs. Vena and demanded that he abandon her bedside and leave her alone in order to return a network component to TMS's office. TMS represented that return of the network component was necessary; however, TMS's computer network had already been fully restored pursuant to the terms of the applicable service agreement, rendering TMS's demand both pretextual and without legitimate operational justification.

48. TMS thus harassed Mr. Vena on at least two separate occasions by telephoning him at the hospital during his wife's critical surgical procedures and demanding that he abandon Mrs. Vena and leave her alone and without assistance, at times when she required continuous monitoring and care. TMS's conduct in this regard was intentional, obstructive, and calculated to interfere with Mr. Vena's ability to care for his critically ill wife.

49. TMS refused to permit Mr. Vena to work from home to assist with Mrs. Vena's care and to monitor her critical oxygen support equipment, despite having allowed him to work remotely during the COVID-19 pandemic and despite affording younger employees comparable workplace flexibility. By requiring Mr. Vena to be physically present at TMS's office rather than at home, TMS knowingly placed Mrs. Vena's oxygen supply at critical risk, as she would have been left alone without any assistance to monitor oxygen flow, respond to tube disconnections, or manually switch over to battery backup equipment in the event of a power failure -- each a potentially life-threatening circumstance given her condition.

50. TMS management engaged in a pattern of harassment and created a hostile work environment directed at Mr. Vena because of his association with his disabled wife, including by

11

repeatedly threatening on two separate occasions to eliminate Mrs. Vena's health insurance coverage while she was undergoing active life-threatening surgical procedures, and by twice summoning Mr. Vena away from her hospital bedside during surgery.

51. TMS's conduct -- including its harassing telephone calls to Mr. Vena at the hospital, its repeated threats to eliminate Mrs. Vena's insurance, its unreasonable denial of remote work, and its indifference to the critical risk posed to Mrs. Vena's oxygen supply -- was intentional. TMS went out of its way to be obstructive to Mrs. Vena's critical care. TMS's actions and statements were severe and pervasive, kept Mr. Vena awake for months, and caused him to suffer significant and lasting physical and emotional harm, including loss of his ability to walk and maintain his equilibrium.

52. TMS's termination of Mr. Vena on October 13, 2023, eliminated Mrs. Vena's BlueCross BlueShield Platinum Plan coverage in the middle of an ongoing course of critical medical treatment, threatening her continued access to the Northwestern Memorial surgical team managing her care.

### E. Mr. Vena's Own Disability and TMS's Failure to Accommodate

53. On August 2, 2023, while at TMS's Chicago office, Mr. Vena suffered a sudden and severe episode of balance impairment, rendering him unable to walk upright and requiring him to brace against a wall to prevent a fall. He remained in his office for approximately two hours before being able to travel home safely.

54. Mr. Vena's physician, Dr. Michael Hanak, issued a written directive by fax to TMS dated August 30, 2023, requiring Mr. Vena to remain home pending diagnostic evaluation, citing multiple falls and episodes of imbalance following August 2, 2023. The physician excused Mr. Vena from work retroactively to July 24, 2023, and prospectively through September 24, 2023. Diagnostic evaluation included MRI scanning, blood testing, and a neurology consultation.

55. Mr. Vena's balance disorder constitutes a physical impairment substantially limiting major life activities including walking, standing, and caring for himself; and/or TMS regarded Mr. Vena as disabled within the meaning of 42 U.S.C. § 12102.

56. The stress, sleep deprivation, and emotional harm caused by TMS's sustained harassment, its repeated threats to eliminate Mrs. Vena's health insurance during active surgical procedures, its obstructive interference with Mr. Vena's caregiving responsibilities, and its intentional disregard for Mrs. Vena's critical oxygen needs materially exacerbated Mr. Vena's own physical condition, contributing to his loss of balance and his inability to walk safely.

57. In response to Mr. Vena's medical condition and physician's directive, TMS: (a) withheld the Short-Term Disability Insurance application and refused to complete the required employer portion; (b) unlawfully seized all remaining accrued PTO benefits without Mr. Vena's consent; (c) ceased payment of his regular salary; (d) engaged in no interactive process to identify reasonable accommodations; and (e) terminated his employment on October 13, 2023, before the diagnostic evaluation was complete.

58. TMS terminated Mr. Vena without affording him any opportunity to review or respond to the negative performance statements it referenced as grounds for termination, contrary to TMS's own established policies and procedures.

**F. TMS's Exclusion of Mr. Vena from the SIMPLE IRA Plan**

59. Prior to April 12, 2012, TMS adopted an IRS Form 5304-SIMPLE IRA Retirement Plan (the "Plan") as TMS's sole employee retirement benefit. Participation was mandatory for all eligible employees; neither TMS nor any eligible employee had authority to opt out of the Plan.

13

60. Under the Plan, an employee became eligible upon receiving at least $5,000 in compensation from TMS in two prior years and being expected to receive $5,000 in the current year. Mr. Vena satisfied these eligibility requirements on or about April 12, 2014.

61. Upon an employee's eligibility, TMS as Plan Sponsor was required under the Plan and IRS regulations to: (a) provide the employee a Participant Invitation Notice; (b) provide the Plan's Summary Description; (c) open a SIMPLE IRA account for the employee; and (d) annually provide written notice of the employee's opportunity to participate prior to each plan year's enrollment window.

62. TMS excluded Mr. Vena from participating in the Plan for six consecutive years -- 2015 through 2020 -- failed to provide the required annual notices and plan invitations to Mr. Vena, failed to open a Plan account for him, and failed to conduct required annual audits. TMS has not made the IRS-required corrective contributions to place Mr. Vena in the position he would have occupied had the error not occurred.

### G. TMS's Retaliation

63. Throughout the period of discrimination described above, Mr. Vena internally advocated for his rights, opposing TMS's unlawful health insurance proposals, requesting Short-Term Disability benefits, and notifying TMS of applicable federal prohibitions including the MSP Act and the ADEA.

64. In response, TMS escalated rather than remedied its discriminatory and hostile conduct. The adverse treatment Mr. Vena experienced increased following each instance of his protected activity.

65. Mr. Vena's termination on October 13, 2023, was in whole or in part in retaliation for his protected activity in opposing age and disability discrimination and in requesting accommodation.

**H. TMS's Failure to Pay Final Compensation and Accrued PTO**

66.     Upon Mr. Vena's termination on October 13, 2023, TMS failed to pay him all earned final compensation, including all accrued and unused PTO benefits, in accordance with TMS's established policies and applicable Illinois law.

67.     Prior to his termination, TMS improperly and without Mr. Vena's consent seized his accrued PTO benefits solely because he had not physically appeared at the office during his physician-ordered absence, contrary to TMS President's longstanding policy permitting salaried employees to work remotely without PTO deduction.

68.     TMS's failure to pay all earned final wages and accrued PTO upon termination violates the IWPCA, 820 ILCS 115/5, and entitles Plaintiff to recovery of the unpaid amounts plus statutory damages of 5% per month on the unpaid balance until paid, plus attorneys' fees and costs.

**CAUSES OF ACTION**

**COUNT I**
**AGE DISCRIMINATION IN EMPLOYMENT ACT -- DISPARATE TREATMENT**
**29 U.S.C. §§ 621–634**

69.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

70.     At all relevant times, Plaintiff was 79 years of age and a member of the class protected by the ADEA. At all relevant times, Plaintiff was performing his duties in a manner meeting or exceeding TMS's legitimate expectations.

71.     Defendant subjected Plaintiff to multiple adverse employment actions on the basis of his age, including replacing him with a substantially younger employee; excluding him from meetings and communications; suppressing his performance evaluations; denying him Short-

15

Term Disability benefits; unlawfully seizing his PTO; denying him remote work privileges extended to younger employees; and terminating his employment.

72. Similarly situated younger employees were treated more favorably in the terms, conditions, and privileges of employment, including benefit access, remote work flexibility, workload, performance procedures, and discipline.

73. Plaintiff's age was the "but-for" cause of the adverse employment actions taken against him. Defendant's violations were willful within the meaning of 29 U.S.C. § 626(b), entitling Plaintiff to liquidated damages equal to all lost wages and benefits.

**COUNT II**
**OLDER WORKERS BENEFITS PROTECTION ACT –**
**DENIAL OF EQUAL BENEFITS**
**29 U.S.C. § 623(f)(2); OWBPA**

74. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

75. The OWBPA prohibits employers from providing employees aged 40 and over with benefits less valuable than those provided to younger employees, absent proof that the cost of providing equal benefits is equal.

76. Defendant denied Plaintiff access to Short-Term Disability benefits by refusing to complete the required employer portion of the application, while permitting younger employees access to those same benefits. Defendant twice proposed eliminating private group health insurance for employees aged 65 and older while retaining it for younger employees. These actions violated 29 U.S.C. § 623(f)(2).

16

**COUNT III**
**AMERICANS WITH DISABILITIES ACT -- ASSOCIATIONAL DISCRIMINATION**
**AND HARASSMENT**
**42 U.S.C. § 12112(b)(4)**

77.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

78.     Mrs. Vena's severe chronic cardiac and pulmonary condition constitutes a disability under 42 U.S.C. § 12102 in that it substantially limits major life activities including the operation of the circulatory and pulmonary systems. TMS had actual knowledge of her disability, her ongoing surgical procedures, and her post-surgical dependence on monitored oxygen support equipment.

79.     Defendant discriminated against and harassed Plaintiff because of his known association with his disabled wife by: refusing him remote work while allowing younger employees comparable flexibility; twice threatening to eliminate Mrs. Vena's insurance during active critical surgical procedures; telephoning Plaintiff at the hospital on two separate occasions during Mrs. Vena's surgical procedures and demanding that he abandon her bedside; knowingly requiring Plaintiff to be absent from home in circumstances placing Mrs. Vena's oxygen supply at critical risk; and terminating Plaintiff's employment, thereby eliminating Mrs. Vena's Platinum Plan coverage in the midst of ongoing critical care. These actions violated 42 U.S.C. § 12112(b)(4).

**COUNT IV**
**AMERICANS WITH DISABILITIES ACT -- DISABILITY DISCRIMINATION**
**42 U.S.C. §§ 12112(a), 12112(b)(5)(A)**

80.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

81. Plaintiff's balance disorder substantially limits major life activities including walking and standing, and/or Defendant regarded Plaintiff as disabled within the meaning of 42 U.S.C. § 12102. Plaintiff was a qualified individual with a disability capable of performing the essential functions of his position.

82. Defendant violated 42 U.S.C. §§ 12112(a) and 12112(b)(5)(A) by: failing to engage in any interactive accommodation process; withholding Short-Term Disability benefits; seizing accrued PTO; halting salary payments during a physician-ordered medical absence; and terminating Plaintiff's employment before the completion of his physician-ordered diagnostic evaluation, without providing any reasonable accommodation.

## COUNT V
## ADEA AND ADA -- RETALIATION
### 29 U.S.C. § 623(d); 42 U.S.C. § 12203

83. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

84. Plaintiff engaged in protected activity under the ADEA by opposing TMS's age-discriminatory health insurance proposals, identifying applicable federal prohibitions, and advocating for his rights as an older employee. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations for his own disability and opposing discriminatory treatment based on his association with his disabled wife.

85. Following Plaintiff's protected activity, Defendant subjected Plaintiff to escalating adverse employment actions, including increased exclusion from communications, unlawful deprivation of PTO and salary, denial of disability benefits, denial of remote work, and termination of employment. A causal connection exists between Plaintiff's protected activity and these adverse actions, demonstrated by the pattern of escalating retaliation following each

instance of protected conduct. Defendant's retaliatory conduct violated 29 U.S.C. § 623(d) and 42 U.S.C. § 12203(a).

**COUNT VI**
**MEDICARE SECONDARY PAYER ACT**
**42 U.S.C. § 1395y(b)**

86.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

87.     At all relevant times, TMS employed thirty-eight (38) or more full-time employees, well exceeding the twenty-employee threshold under the MSP Act. Medicare was therefore the secondary payer and TMS's private BlueCross BlueShield group health plan was the primary payer with respect to Plaintiff's medical claims.

88.     The MSP Act expressly prohibits employers from taking into account an employee's Medicare eligibility in making group health plan coverage decisions. 42 U.S.C. § 1395y(b)(3)(C). On two separate occasions within an eighteen-month period, TMS proposed to drop private group health insurance for all employees aged 65 and older, explicitly because those employees were entitled to Medicare. Both proposals violated the MSP Act and were withdrawn only after applicable federal prohibitions were identified. Plaintiff suffered emotional distress, financial harm, and threatened disruption of his wife's critical medical care as a direct result of Defendant's MSP Act violations.

**COUNT VII**
**EMPLOYEE RETIREMENT INCOME SECURITY ACT**
**29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3)**

89.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

19

90.     TMS's IRS Form 5304-SIMPLE IRA Plan constitutes an "employee pension benefit plan" under ERISA, 29 U.S.C. § 1002(2). TMS served as Plan Sponsor and Plan Administrator and owed fiduciary duties to all Plan participants, including Plaintiff.

91.     Plaintiff became eligible to participate in the Plan no later than April 12, 2014. TMS failed to add Plaintiff to the Plan, failed to provide required annual notices for six consecutive years, failed to open a Plan account for him, and has failed to make the IRS-required corrective contributions for years, as noted in ¶62, above. Plaintiff was deprived of six years of retirement savings contributions and associated earnings during the critical period of his approach to retirement age.

92.     Plaintiff is entitled under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to recover all benefits due under the Plan. Plaintiff is further entitled under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to make-whole equitable relief including all missed contributions and earnings calculated from the date contributions should have been made through the date of full correction, consistent with IRS SIMPLE IRA correction guidance.

**COUNT VIII**
**FAIR LABOR STANDARDS ACT -- OVERTIME / MISCLASSIFICATION**
**29 U.S.C. §§ 201, *et seq.***

93.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

94.     At all relevant times, TMS was an "enterprise engaged in commerce" within the meaning of the FLSA, 29 U.S.C. § 203(s), and Plaintiff was an "employee" engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(e).

20

95. The FLSA requires covered employers to pay non-exempt employees overtime compensation at a rate of one and one-half times the employee's regular rate of pay for all hours worked in excess of forty (40) per workweek. 29 U.S.C. § 207(a)(1).

96. Throughout his eleven-year employment, TMS required and suffered or permitted Plaintiff to regularly work in excess of forty (40) hours per workweek -- and in excess of seventy (70) hours per workweek in the latter period of his employment -- without paying any overtime compensation whatsoever.

97. TMS classified Plaintiff as exempt from the FLSA's overtime requirements from the date of his hire through his termination. That classification was unlawful. Plaintiff did not qualify for any applicable FLSA exemption: (a) he was not an "executive employee" because he did not customarily and regularly direct the work of two or more employees, and lacked authority to hire or fire; (b) he was not an "administrative employee" because his primary duty was hands-on operational and technical work requiring supervisor approval, not the exercise of independent discretion and judgment on matters of significance; and (c) he did not qualify for the "professional" exemption for similar reasons. See 29 C.F.R. §§ 541.100, 541.200, 541.300.

98. Evidence of Plaintiff's hours worked is preserved in: TMS's own security network camera recordings; the office building's elevator camera recordings; the main first-floor building exit camera records; and TMS's Online QuickBooks accounting records -- all of which were maintained throughout his entire tenure.

99. Defendant's misclassification and failure to pay overtime was willful within the meaning of 29 U.S.C. § 255(a). TMS, as a law firm staffed by attorneys, knew or showed reckless disregard for whether its conduct violated the FLSA. Accordingly, the three-year limitations period applies. 29 U.S.C. § 255(a).

100. As a direct and proximate result of Defendant's willful FLSA violations, Plaintiff is entitled to: (a) all unpaid overtime compensation for the three-year period preceding the filing of this action, calculated at one and one-half times his regular rate of pay for each overtime hour; (b) an equal amount in liquidated damages pursuant to 29 U.S.C. § 216(b); (c) pre-judgment interest; and (d) reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**COUNT IX**
**ILLINOIS MINIMUM WAGE LAW -- OVERTIME VIOLATIONS**
**820 ILCS 105/1, *et seq.***

101. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

102. The Illinois Minimum Wage Law requires employers to pay employees overtime compensation at a rate of one and one-half times the regular rate of pay for all hours worked in excess of forty (40) per work week. 820 ILCS 105/4a.

103. At all relevant times, Plaintiff was an "employee" within the meaning of the IMWL, 820 ILCS 105/3(d), and Defendant was an "employer" within the meaning of the IMWL, 820 ILCS 105/3(c).

104. Throughout his employment, Defendant required Plaintiff to work in excess of forty (40) hours per workweek on a consistent, regular basis without paying any overtime compensation, in willful violation of 820 ILCS 105/4a.

105. As a direct and proximate result of Defendant's violations of the IMWL, Plaintiff is entitled to recover all unpaid overtime compensation, plus punitive damages in an amount not to exceed two percent (2%) per month of the amount of underpayment pursuant to 820 ILCS 105/12(a), plus attorneys' fees and costs.

22

**COUNT X**
**ILLINOIS WAGE PAYMENT AND COLLECTION ACT –**
**UNPAID FINAL COMPENSATION**
**820 ILCS 115/1, *et seq.***

106. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

107. The IWPCA requires employers to pay all earned compensation, including accrued vacation and PTO, to employees at the time of separation or within the time periods prescribed by statute. 820 ILCS 115/5; 820 ILCS 115/4. Under Illinois law and established precedent, accrued but unused PTO constitutes "wages" that must be paid upon termination.

108. At all relevant times, Plaintiff was an "employee" within the meaning of the IWPCA, 820 ILCS 115/2, and Defendant was an "employer" within the meaning of the IWPCA, 820 ILCS 115/2.

109. Defendant failed to pay Plaintiff all earned final compensation upon his termination on October 13, 2023, including all accrued and unused PTO that was unlawfully seized without Plaintiff's consent during his physician-ordered medical absence. Based on Plaintiff's final annual salary of $89,995.61, the value of twelve (12) unlawfully withheld PTO days is approximately $4,153.80, plus additional final compensation amounts to be determined.

110. Defendant's failure to pay all earned final compensation violated 820 ILCS 115/5. Plaintiff is entitled to recover all unpaid compensation plus statutory damages equal to five percent (5%) of the amount of underpayment per month until paid, plus reasonable attorneys' fees and costs, pursuant to 820 ILCS 115/14(a).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Dennis Vena respectfully requests that this Court enter judgment in his favor and against Defendant Thomas More Society, and grant the following relief:

A. Declare that Defendant's conduct violated the ADEA, the OWBPA, the ADA, the MSP Act, ERISA, the FLSA, the IMWL, and the IWPCA;

B. Award Plaintiff compensatory damages for all back pay, front pay, lost wages, lost salary, and lost benefits resulting from Defendant's unlawful conduct, including the value of all unpaid overtime compensation for the applicable limitations period at one and one-half times his regular rate of pay;

C. Award Plaintiff liquidated damages under the ADEA in an amount equal to all back pay and benefits lost, based on Defendant's willful violation of the ADEA;

D. Award Plaintiff liquidated damages under the FLSA in an amount equal to all unpaid overtime compensation, based on Defendant's willful misclassification and failure to pay overtime;

E. Award Plaintiff compensatory damages for emotional distress, pain and suffering, mental anguish, sleep deprivation, and physical injury -- including loss of balance and ability to walk -- resulting from Defendant's ADA violations and sustained harassment;

F. Award Plaintiff make-whole ERISA relief, including all missed SIMPLE IRA contributions and earnings calculated from the date contributions should have been made through the date of full correction, with interest;

G. Award damages and any applicable civil monetary penalties arising from Defendant's violations of the Medicare Secondary Payer Act;

24

H.  Award Plaintiff the value of all Short-Term Disability benefits wrongfully denied, all unlawfully withheld PTO benefits (including the statutory 5% per month damages under the IWPCA), and all other employee benefits improperly denied;

I.  Award Plaintiff punitive damages under IMWL, 820 ILCS 105/12(a), not to exceed 2% per month of the underpayment, and any other punitive or exemplary damages available under applicable law;

J.  Award Plaintiff his reasonable attorneys' fees, expert witness fees, and costs of this action pursuant to 29 U.S.C. § 626(b), 42 U.S.C. § 12205, 29 U.S.C. § 1132(g), 29 U.S.C. § 216(b), 820 ILCS 105/12(a), and 820 ILCS 115/14(a);

K.  Award pre-judgment and post-judgment interest at the maximum rate permitted by law;

L.  Order such injunctive relief as may be appropriate, including requiring Defendant to make corrective SIMPLE IRA contributions, to classify similarly situated employees correctly under the FLSA, and to implement lawful equal benefits policies;

M.  Retain jurisdiction to ensure compliance with the Court's orders; and

N.  Grant such other and further relief as this Court deems just, equitable, and proper.

### JURY DEMAND

**Plaintiff Dennis Vena hereby demands a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).**

Dated: April 6, 2026                                      Respectfully submitted,

Patrick D. Dolan, IARDC No. 6244458              DENNIS VENA.
CONTI & DOLAN, LLC
55 West Monroe Street, Suite 3330
Chicago, Illinois 60603                                  By: /s/ Patrick D. Dolan
Tel. (312) 878-3210                                          *One of Plaintiff's Attorneys*
pdolan@contidolanlaw.com

25